UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ROOSTER PETROLEUM, LLC** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 12-1322** |
| | * | |
| **FAIRWAYS OFFSHORE EXPLORATION, INC., ET AL.** | * | **SECTION "L"(1)** |
| | * | |

## ORDER AND REASONS

The Court has pending before it two motions for summary judgment. (Rec. Docs. 39, 48). The Court has reviewed the briefs and the applicable law and heard oral argument, and now issues this Order and Reasons.

**I.    BACKGROUND**

This case involves a conflict over oil and gas processing facilities on High Island 154 A ("HI 154 A"), a fixed offshore platform located on the Gulf of Mexico on the Outer Continental Shelf. The uncontested facts are as follows. Defendant Fairways Offshore Exploration, Inc. ("Fairways") owned the lease covering HI 154 for several years. Fairways still owns the HI 154 A platform and associated facilities on HI 154. Plaintiff Rooster Oil, LLC is a co-owner of the lease covering High Island 141 ("HI 141"), and Plaintiff Rooster Petroleum, LLC is the designated operator of HI 141. A pipeline connects HI 141 to HI 154 A, such that all HI 141 production flows to HI 154 A for processing.

In 2007, Fairways and Rooster Petroleum entered into a Platform Use Agreement ("PUA") designating Rooster Petroleum as the operator of the HI 154 A facilities and granting Rooster Petroleum the right to use and access the HI 154 A facilities to process production from both HI 141 and HI 154. (Ex. 2 to Pls.' Mot Summ. J., Rec. Doc. 39-4). The PUA includes an

express termination clause, which states: "This Agreement will remain in full force and effect so long as TD Block 141 Well(s) are determined to be producing in paying quantities in accordance with CFR 250.11 and each is producing to the [HI 154 A] Facilities." *Id.* at p. 8, ¶ 11.1. The PUA is also expressly made "subject to all valid, applicable federal, state and local laws, rules and regulations." *Id.* at p. 12, ¶ 20.1. Furthermore, two provisions state that the PUA is for the "mutual benefit" of the two parties. *Id.* at p. 1, ¶ 1.3.

Production from Fairways' HI 154 lease stopped on August 14, 2011. Fairways' lease provided that it would expire 180 days after the cessation of production, on February 20, 2012. (Ex. 1, Attach. A to Def.'s Mot. Summ. J., Rec. Doc. 48-2 at 11-17). Since HI 141 was still producing, Rooster Petroleum wanted to preserve access to the HI 154 A facilities. Therefore, on December 12, 2011, Rooster Petroleum requested a right-of-use and easement ("RUE") from Defendant Bureau of Ocean Energy Management ("BOEM") for the purpose of maintaining the HI 154 A facilities. (Ex. 3 to Pls.' Mot. Summ. J., Rec. Doc. 39-5 at 1). Rooster Petroleum's RUE request stated: "The expiration of [Fairways' lease] will cause the currently [*sic*] authority for the use of [the HI 154 A facilities] to expire." *Id.*

Under 30 C.F.R. § 550.160(d), Rooster Petroleum was required to notify Fairways, and Fairways had an opportunity to comment on the RUE request. On February 10, 2012, Fairways sent a letter to BOEM summarizing its concerns with the request and requesting "proper notice, a copy of [Rooster Petroleum's RUE] request, and an opportunity to comment thereon." (Ex. 5 to Pls.' Mot. Summ. J., Rec. Doc. 39-7 at 3). On March 30, 2012, Fairways sent a letter to BOEM formally objecting to Rooster's request. (Ex. 6 to Pls.' Mot. Summ. J., Rec. Doc. 39-8). The letter cites Fairways' obligation to decommission the HI 154 A facilities within one year of lease

expiration and the financial risk of delaying this process until after the 2012 storm season. *Id.* at 2-3. Additionally, Fairways' letter states: "The effect of lease expiration is that Fairways no longer has any authority to allow Rooster to operate the Platform on the former leased area, and Lease expiration also terminates the Platform Use Agreement." *Id.* at 3.

On April 16, 2012, BOEM denied the RUE request. (Ex. 8 to Pls.' Mot. Summ. J., Rec. Doc. 39-10). BOEM's letter stated: "The former lessee and facility owner, Fairways Offshore Exploration, refuses to consent to your access and use of its property. Therefore, there is no basis upon which BOEM can grant a right-of-use and easement." *Id.* at 1. Rooster Petroleum has since commenced an administrative appeal of this denial (Ex. 4 to Def.'s Mot. Summ. J., Rec. Doc. 48-2 at 46-67), and BOEM has filed an Answer to Rooster Petroleum's Statement of Reasons (Ex. 7 to Def.'s Mot. Summ. J., Rec. Doc. 48-2 at 86-104). This Answer states that BOEM denied Rooster's RUE request because "it seeks relief that is outside the scope of BOEM's authority under governing regulations"—specifically, "BOEM's authority to issue RUEs does not encompass the power to authorize Rooster to co-opt the private property of a third party against that party's will." *Id.* at 88.

The Bureau of Safety and Environmental Enforcement ("BSEE") ordered that HI 141 production be shut in on May 15, 2012. No production from HI 141 has taken place since that date. Additionally, Fairways alleges that, due to multiple unresolved Incidents of Non-Compliance, BSEE ordered production shut in on June 13, 2012.

Plaintiffs Rooster Oil & Gas and Rooster Petroleum (collectively, "Rooster") now bring suit against Fairways as well as BOEM and Regional Director John L. Rodi (collectively, the "Federal Defendants"). In the First Amended Complaint, Rooster alleges that Fairways breached

the PUA when it objected to the RUE request and when it declared the PUA to be terminated in its letter to BOEM. (Rec. Doc. 23 at ¶ 8). Rooster asks for declaratory and permanent injunctive relief, or alternatively damages, or alternatively specific performance. *Id.* at ¶¶ 31-41.[1] Fairways' Answer denies liability and also submits a counterclaim for unjust enrichment. (Rec. Doc. 26 at pp. 11-13, ¶¶ 1-14). Fairways alleges that "the PUA terminated by operation of law" when Fairways' lease expired on February 10, 2012, *id.* at p. 12, ¶ 8, and as a result, Rooster knew or should have known that Fairways would have expected to be compensated for Rooster's continued use of the platform beyond that date, *id.* at p. 12-13, ¶ 12.[2]

On June 5, 2012, Rooster moved for a preliminary injunction against both Fairways and the Federal Defendants. (Rec. Doc. 5). Rooster sought to preserve its ability to produce from HI 141 using the HI 154 A facilities during the pendency of this lawsuit; otherwise, its lease would be in danger of expiring after 6 months of nonproduction. Rooster and the Federal Defendants reached a Stipulation that resolved part of Rooster's motion. (Rec. Doc. 20). On August 8, 2012, this Court denied the remainder of Rooster's motion on the grounds that the loss of Rooster's OCS lease would not constitute irreparable harm, since Rooster could be fully compensated by an award of money damages after final judgment. (Rec. Doc. 36).

---

[1]Rooster also seeks injunctive relief against the Federal Defendants, alleging that the BOEM violated both its governing regulations and the APA when it denied Rooster's RUE request. *Id.* at ¶¶ 42-53. However, these claims are not involved in the present motions for summary judgment.

[2]On August 17, 2012, Rooster moved for the dismissal of Fairways' counterclaim for unjust enrichment on the grounds that it fails to state a claim upon which relief can be granted. (Rec. Doc. 38). In a separate Order and Reasons also issued on this date, this Court grants Rooster's motion, but gives Fairways leave to amend its counterclaim within 30 days. Additionally, this Court holds that Texas law governs this dispute.

**II.      PRESENT MOTION**

Rooster and Fairways now submit largely overlapping motions for summary judgment. (Rec. Docs. 39, 48). Three main issues are in dispute: whether the PUA remained in effect when Fairways' OCS lease expired, whether Fairways' objection to Rooster's RUE request constituted a breach of the PUA, and whether Fairways' objection caused Rooster's damages. Fairways also moves for summary judgment on Rooster's claims for specific performance and injunctive relief, arguing that they cannot be sustained because Rooster has an adequate remedy at law for any harm resulting from the alleged breach of the PUA.

**III.     LAW AND ANALYSIS**

**A.      Standard of Review**

Summary judgment is appropriate if the moving party can show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Federal Rule of Civil Procedure 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *See Prejean v. Foster*, 227 F.3d 504, 508 (5th Cir. 2000). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to the

nonmovant. *Id*. at 255.

**B.     Analysis**

   **1.     Termination of the PUA**

Rooster argues that the PUA is unambiguous with respect to whether it terminated upon the expiration of Fairways' lease. Rooster cites Article 11.1 of the PUA, which states: "This Agreement will remain in full force and effect so long as TD Block 141 Well(s) are determined to be producing in paying quantities in accordance with CFR 250.11 and each is producing to the [HI 154 A] Facilities." (Rec. Doc. 39-4 at p. 8, ¶ 11.1). Rooster argues that this provision is clear, and as a result, the Court must enforce it as written. *Birnbaum v. Swepi LP*, 48 S.W.3d 254, 257 (Tex. App. 2001). Rooster emphasizes that this is the only termination provision included in the contract, and as a result, these are the only circumstances under which the PUA may terminate. Rooster argues that in this case, the contract "is so worded that it can be given a certain or definite legal meaning or interpretation," and accordingly, "it is not ambiguous, and the court [must] construe the contract as a matter of law." *Consol. Petroleum Partners, I, LLC v. Tindle*, 168 S.W.3d 894, 898 (Tex. App. 2005) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). Furthermore, Rooster emphasizes that under Texas law, "[p]arties to a contract are masters of their own choices are entitled to select what terms and provisions to include in *or omit from* a contract." *Consol. Petroleum Partners*, 650 S.W.2d at 899 (citing *Birnbaum*, 48 S.W.3d at 257) (emphasis added). Thus, Rooster argues, the parties in this case are bound by their choice to omit other termination provisions from the contract.[3]

---

[3]Rooster also argues that the circumstances underlying the PUA have not changed since that agreement was executed in 2007. Fairways disputes this conclusion, arguing that the "mutual benefit" originally underlying the contract is no longer present. *See* note 6 *infra*. This is

Fairways argues that the PUA *did* terminate when Fairways' lease expired. Fairways puts forth two basic arguments in favor of this conclusion. First, Fairways argues that it could not have conveyed greater rights in the Platform than Fairways itself possessed. Fairways claims that it "had no rights to use and access its OCS Platform at HI 154 beyond those conferred by its Lease," and therefore, "Rooster had no rights at HI 154 beyond those derivative rights" it obtained through the PUA. (Def.'s Opp., Rec. Doc. 52 at 12). Fairways argues that once its lease expired on February 10, 2012, "Fairways no longer had authorization to continue operations or to maintain a presence on the federal government's OCS property except to satisfy its residual decommissioning obligation." (Def.'s Mot. Summ. J., Rec. Doc. 48-1 at 18). Therefore, Fairways claims that it could not have conveyed to Rooster, via the PUA, the authorization to continue those operations.[4]

However, Fairways slightly misrepresents the nature of its regulatory obligations in making this argument. Fairways' lease expressly allows for the possibility of continued maintenance of the platform after termination of the lease "for whatever longer period it may be needed, as determined by the Supervisor, for producing wells or for drilling or production on other leases." (Ex. 1, Attach. A., Def.'s Mot. Summ. J., Rec. Doc. 48-2 at p. 17, § 9).[5] Therefore,

an issue for the trier of fact.

[4] In support of this argument, Fairways cites Rooster's statement in its RUE request that new authority would be required for Rooster to continue to maintain the platform after Fairways' lease expired. However, as Rooster points out, this argument is slightly misleading, as there are two types of authority that Rooster needed to continue to operate the platform: authority from the federal government (the owner of the OCS), and authority from Fairways (the owner of the platform). Rooster's statement could very well have referred to the former; Rooster's position is that the PUA bestowed Rooster with the latter.

[5] Federal regulations also provide for the possibility of an extension of the decommissioning deadline under similar circumstances. *See* 30 C.F.R. § 250.1725(a).

the PUA did not necessarily contradict Fairways' lease in providing that Rooster would continue to operate the platform as long as Rooster's lease was still producing in paying quantities. Fairways has the ability to allow Rooster to continue to operate the platform past the expiration of Fairways' lease; Fairways must simply petition BOEM for approval to do so. In fact, Fairways' own letter of objection to Rooster's RUE request acknowledges this possibility. (Rec. Doc. 39-8 at 2). Thus, Fairways would not exceed the terms of its own lease if it agreed to allow Rooster to use the platform as long as Rooster's lease produces in paying quantities.

Second, Fairways points to two provisions of the PUA suggesting that it terminated when Fairways' lease expired. One provision states that the PUA was made "subject to all valid, applicable federal, state and local laws, rules and regulations." (Rec. Doc. 39-4 at p. 12, ¶ 20.1). The following provision states: "Neither Fairways nor [Rooster's predecessor in interest] shall be liable to the other for any delays or damages . . . due, occasioned or caused by reason of federal state laws or the rules, regulations or orders of any public body or official purporting to exercise control respecting the operations covered hereby . . . ." *Id.* at ¶ 20.2. Fairways argues that according to these provisions, Fairways' OCS Lease and its corresponding limitations trump the PUA.[6] Essentially, Fairways argues that Rooster is taking Article 11.1 out of context, and that the context of the entire agreement suggests the parties' intention that the PUA would terminate when Fairways' lease terminated. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229

---

[6]Fairways also cites Article 1.3 of the PUA, which defines as the "Operator" the party chosen "to conduct all operations on the platform for the mutual benefit of the HI 141 wells and the Fairways Blocks 151 wells," and the preamble to the agreement, which uses the same "mutual benefit" terminology. *Id.* at p. 1, ¶ 1.3. Fairways argues that after its lease expired, "that mutual benefit disappeared and became completely one-sided," thus invalidating the agreement from that point forward. (Def.'s Mot. Summ. J., Rec. Doc. 48-1 at 20-21). As stated in note 3, *supra*, this is an issue for the trier of fact.

(Tex. 2003) (requiring courts to "give effect to all the provisions of the contract so that none will be rendered meaningless," considering the context of the entire instrument rather than giving "controlling effect" to a "single provision taken alone").

The Court agrees with Rooster that the express language of the PUA must control the outcome here. Article 11.1 is the sole termination provision, and it unambiguously states that the agreement remains in effect until the cessation of production from HI 141. Article 20.1 is simply too vague to require that the clear language of Article 11.1 be construed in any other way. Furthermore, both parties in this case are sophisticated business entities, and they negotiated this agreement at arms length for their mutual benefit. If they wanted the PUA to terminate upon the expiration of the OCS lease, they could easily have included unambiguous language to that effect in the section of the PUA labeled "Article 11: Termination."

Accordingly, the Court holds that the PUA remained in effect following the termination of Fairways' lease and grants summary judgment to Rooster on that issue.

2. **Breach of the PUA**

Having found that the PUA did not terminate upon the termination of Fairways' OCS lease, the Court now addresses whether Fairways' conduct constituted breach of the PUA. In the First Amended Complaint, Rooster claims that Fairways breached the PUA in two separate ways: by filing an objection to Rooster's RUE request and by prematurely declaring the PUA to have terminated. Fairways' primary argument in opposition to Rooster's first theory is that Rooster's RUE request was itself defective. The Court understands that this issue is the subject of an administrative proceeding currently pending before the Interior Board of Land Appeals. (Rec. Doc. 48-2 at 46-67). Based on the various briefs and evidence submitted thus far, it does

appear to this Court that Rooster's RUE request incorrectly asked BOEM for permission to use both the platform and the seabed. Nonetheless, it would be inappropriate for this Court to rule on that issue at this time due to the pending administrative appeal.[7]

The Court can rule on Rooster's second theory, however. Rooster argues that Fairways breached the PUA by terminating the agreement in violation of Article 11.1's express termination provision. Fairways' letter objecting to Rooster's RUE request stated: "The effect of lease expiration is that Fairways no longer has any authority to allow Rooster to operate the Platform on the former leased area, and Lease expiration also terminates the Platform Use Agreement." (Rec. Doc. 39-8 at 3). Rooster argues that this statement amounts to improper termination, which "is a breach of contract as a matter of law." *Gunter Hotel of San Antonio, Inc. v. Buck*, 775 S.W.2d 689, 697 (Tex. App. 1989). In opposition, Fairways reiterates its arguments that the PUA had already terminated when Fairways' lease expired.

The Court has already held that the PUA remained in effect following the termination of Fairways' lease. As a result, the Court agrees with Rooster that Fairways breached the PUA when it declared that the agreement had terminated. Rooster's motion for summary judgment with respect to the breach of the PUA by wrongful termination is granted.

### 3. Causation of Damages

The parties also disagree over whether Rooster can prove that Fairways caused any of Rooster's potential damages in this case. Rooster argues that it is entitled to summary judgment in its favor on this issue. In support of this argument, Rooster cites two main facts. First, Rooster

---

[7]Because this issue may be fully resolved by the substance of the administrative appeal, the Court also does not decide at this time whether *REO Industries v. Natural Gas Pipeline Co. of Am.*, 932 F.2d 447 (5th Cir. 1991), controls the resolution of this issue.

notes that Fairways' objection was the only factor BOEM mentioned when it denied Rooster's RUE request. Second, Rooster points to the Stipulation it reached with BOEM in order to resolve Rooster's motion for a preliminary injunction against the Federal Defendants. (Rec. Doc. 20). In that Stipulation, BOEM agreed to issue a temporary RUE allowing Rooster access to the relevant portion of the seabed if Rooster prevailed on its motion for a preliminary injunction against Fairways, and as long as all other regulatory requirements were met. *Id.* at ¶¶ 2-3. Thus, Rooster argues, "it is likely that the BOEM would have granted the RUE, absent Fairways' objection." (Pls.' Mot. Summ. J., Rec. Doc. 39-2 at 13).

Drawing all inferences in the light most favorable to Fairways, the Court does not believe that Rooster has shown the lack of a genuine issue of material fact with respect to causation of damages. As Fairways argues, Rooster's Stipulation with BOEM could be confined to its circumstances—that is, the resolution of Rooster's motion for a preliminary injunction—and given no relevance to Rooster's original RUE request. Furthermore, given the possibility that Rooster's RUE request was actually defective, the actual impact of Fairways' objection remains unclear. Rooster's motion for summary judgment on this issue must be denied.

In turn, Fairways argues that Rooster cannot prove causation of damages for several reasons. First, Fairways argues that "there is no probative certainty" that Rooster's RUE application would have been approved absent Fairways' objection. *REO Industries v. Natural Gas Pipeline Co. of Am.*, 932 F.2d 447, 458 (5th Cir. 1991). Here, Fairways reiterates its argument that Rooster's RUE request was defective. Second, Fairways cites the provision in the governing regulations stating that RUE grants are discretionary. 30 C.F.R. § 550.160 ("BOEM *may* grant you a right-of-use and easement . . . ." (emphasis added)). Third, Fairways argues that

even if Rooster's RUE request had been proper, documents from the BSEE show that Rooster was issued multiple Incidents of Non-Compliance, which were not resolved, resulting in a shut-in order from BSEE on June 13, 2012. Fairways argues that in light of these events, it is doubtful that Rooster could have continued to produce from HI 141 even if its RUE request had been approved. Finally, Fairways argues that Rooster could use other means to produce from HI 141 even if the HI 154 A facilities are no longer available for use, and that Rooster has the ability to request an extension of its OCS lease from BSEE during this litigation pursuant to 30 C.F.R. § 250.172.

While Fairways casts some doubt on Rooster's ability to prove that Fairways caused its damages, Fairways has not shown the lack of a genuine issue of material fact on this issue. As noted above, the issue of whether Rooster's RUE request is defective remains pending before the Interior Board of Land Appeals. As a result, the Court does not find it appropriate to rule on that issue at this time. Furthermore, even if Rooster's RUE request is later found to be defective, that conclusion would only influence the issue of whether Fairways caused damages to Rooster *when it objected to Rooster's RUE request*. It would not necessarily control the resolution of whether Fairways caused damage to Rooster *when it prematurely terminated the PUA*.

The remaining arguments set forth by Fairways all complicate Rooster's task in proving causation of damages at trial, but they do not make that task impossible. For example, the discretionary nature of RUE requests will make it more difficult for Rooster to prove that BOEM would have granted its request absent Fairways' breach, but not necessarily impossible, especially given the Stipulation reached by Rooster and BOEM in advance of Rooster's motion for a preliminary injunction. Furthermore, the presence of other problems with regulatory

12

compliance might prevent Rooster from proving that Fairways caused its damages, but the Court cannot say so without further development of the underlying facts. And even if Rooster can use other means to produce from HI 141, those means would conceivably be more expensive than using HI 154 A under the PUA, and Rooster might be able to show that Fairways caused damages in the form of increased production costs.

Accordingly, neither Rooster nor Fairways is entitled to summary judgment on the issue of causation of damages. Both parties' motions for summary judgment on this issue are denied.

### 4. Specific Performance and Injunctive Relief

Fairways argues that it is entitled to summary judgment against Rooster on Counts One, Two, and Four of the First Amended Complaint, which contain requests for preliminary injunctive relief, permanent injunctive relief, and specific performance against Fairways. Since Rooster's opposition to Fairways' motion does not address this issue, the Court deems this portion of Fairways' motion unopposed and grants summary judgment in favor of Fairways on Counts One, Two, and Four of the First Amended Complaint.

## IV. CONCLUSION

For the foregoing reasons, IT IS ORDERED that both Rooster's motion for partial summary judgment (Rec. Doc. 39) and Fairways' motion for summary judgment (Rec. Doc. 48) are GRANTED IN PART. Specifically, Rooster's motion is GRANTED with respect to the termination of the PUA and the breach of the PUA by wrongful termination and DENIED with respect to the breach of the PUA by Fairways' objection and causation of damages. Fairways' motion is GRANTED with respect to Rooster's claims for equitable relief and DENIED with respect to the termination of the PUA, the breach of the PUA, and causation of damages.

New Orleans, Louisiana, this 10th day of October, 2012.

_____
UNITED STATES DISTRICT JUDGE