UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ROOSTER PETROLEUM, LLC, ET AL. | CIVIL ACTION |
| VERSUS | NO. 12-1322 |
| FAIRWAYS OFFSHORE EXPLORATION, INC., ET AL. | SECTION "L" (1) |

**ORDER & REASONS**

Previously, the Court considered Defendant Fairways Offshore Exploration, Inc.'s ("Fairways") and Plaintiffs Rooster Petroleum, LLC's and Rooster Oil and Gas, LLC's (collectively "Rooster") cross-motions for summary judgment (Rec. Docs. 39, 48), resolving all but one of the issues raised (Rec. Doc. 62). On October 4, 2013, the Court heard argument on that remaining issue: namely, whether Fairways breached the parties' platform use agreement ("PUA") when it objected to Rooster's December 12, 2011, right-of-use and easement ("RUE") request. The Court withheld ruling on that issue after the parties filed additional cross-motions for summary judgment. (Rec. Docs. 122, 124). On October 31, 2013, the Court heard argument on the new motions. Having considered the briefs and the applicable law, the Court now issues this order.

**I.   BACKGROUND**

This case involves a conflict over oil and gas processing facilities on High Island 154 ("HI 154"), a fixed offshore platform located in the Gulf of Mexico on the Outer Continental Shelf. Fairways owned the lease covering HI 154 for several years. Fairways still owns the HI 154 platform and associated facilities on HI 154. Rooster is a co-owner of the lease covering High Island 141 ("HI 141") and the designated operator of HI 154. A pipeline connects HI 141 to HI 154, such that all HI 141 production flows to HI 154 for processing.

In 2007, Fairways and Rooster entered into a PUA designating Rooster as the operator of the HI 154 facilities and granting it the right to use and the right to access the HI 154 facilities to process production from both HI 141 and HI 154. (Rec. Doc. 39-4). Production from Fairways' HI 154 lease stopped on August 14, 2011, and its lease was scheduled to expire on February 20, 2012, 180 days after the cessation of production. (Rec. Doc. 48-2 at 11-17). Because HI 141 was still producing, Rooster wanted to preserve access to the HI 154 facilities so that it could continue to process the product from HI 141. Therefore, on December 12, 2011, Rooster requested a RUE from now-dismissed Defendant Bureau of Ocean Energy Management ("BOEM") for the purpose of maintaining the HI 154 facilities. (Doc. 39-5 at 1). Rooster's RUE request stated: "The expiration of [Fairways' lease] will cause the currently [*sic*] authority for the use of [the HI 154 facilities] to expire." (*Id.*).

Pursuant to 30 C.F.R. § 550.160(d), Rooster was required to notify Fairways of its RUE request and provide Fairways an opportunity to comment on it. Fairways claims that it did not receive proper notice or an opportunity to comment. On February 10, 2012, Fairways sent a letter to BOEM summarizing its concerns with the request and requesting "proper notice, a copy of [Rooster's RUE] request, and an opportunity to comment thereon." (Rec. Doc. 39-7 at 3). On March 30, 2012, Fairways sent another letter to BOEM formally objecting to Rooster's request. (Rec. Doc. 39-8). That letter cited Fairways' obligation to decommission the HI 154 facilities within one year of the lease's expiration and the financial risk of delaying this process until after the 2012 storm season. (*Id.* at 2-3). Additionally, Fairways' letter stated: "The effect of lease expiration is that Fairways no longer has any authority to allow Rooster to operate the Platform on the former leased area, and Lease expiration also terminates the [PUA]." (*Id.* at 3).

On April 16, 2012, BOEM denied the RUE request. (Rec. Doc. 39-10). BOEM's letter stated: "The former lessee and facility owner, Fairways . . . , refuses to consent to your access and use of its property . . . [t]herefore, there is no basis upon which BOEM can grant a [RUE]." (*Id.* at 1). Rooster then commenced an administrative appeal of this denial (Rec. Doc. 48-2 at 46-67), and BOEM filed an answer to Rooster's statement of reasons (*Id.* at 86-104). The answer stated that BOEM denied Rooster's RUE request because "it [sought] relief that is outside the scope of BOEM's authority under governing regulations"─specifically, "BOEM's authority to issue RUEs does not encompass the power to authorize Rooster to co-opt the private property of a third party against that party's will." (*Id.* at 88). On May 15, 2012, the Bureau of Safety and Environmental Enforcement ("BSEE") ordered that HI 141 production be shut in. It appears that no production from HI 141 has taken place since that date.

Rooster brought suit against Fairways, as well as BOEM and its regional director (collectively "BOEM"). In its first amended complaint, Rooster alleges that Fairways breached the PUA when it objected to the RUE request and when it declared the PUA to be terminated in its letter to BOEM. (Rec. Doc. 23). Rooster asks for declaratory and permanent injunctive relief, or alternatively damages, or alternatively specific performance.[1] (*Id.*). Fairways' answer denies liability and also submits a counterclaim for unjust enrichment. (Rec. Doc. 26). Fairways alleges that "the PUA terminated by operation of law" when Fairways' lease expired on February 10, 2012, and as a result, Rooster knew or should have known that Fairways would have expected to be compensated for Rooster's continued use of the platform beyond that date.[2] (*Id.* at 12-13).

---

[1] Rooster also sought injunctive relief against BOEM, alleging that BOEM violated both its governing regulations and the Administrative Procedure Act ("APA") when it denied Rooster's RUE request. However, those claims have since been dismissed.

[2] On August 17, 2012, Rooster moved for the dismissal of Fairways' counterclaim for unjust enrichment on the grounds that it fails to state a claim upon which relief can be granted. In a separate order, the Court granted Rooster's motion, but gave Fairways leave to amend its counterclaim within 30 days.

On June 5, 2012, Rooster moved for a preliminary injunction against both Fairways and BOEM. (Rec. Doc. 5). Rooster sought to preserve its ability to produce from HI 141 using the HI 154 facilities during the pendency of this action; otherwise, its lease would have expired after six months of nonproduction. Rooster and the BOEM reached a stipulation that resolved part of Rooster's motion. (Rec. Doc. 20). On August 8, 2012, this Court denied the remainder of Rooster's motion on the grounds that the loss of Rooster's OCS lease would not constitute irreparable harm, because Rooster could be fully compensated by an award of money damages after final judgment. (Rec. Doc. 36).

In its October 15, 2013, order, out of which the present issue arises, the Court addressed largely overlapping motions for summary judgment by Rooster and Fairways. (Rec. Doc. 62). The main issues in dispute were (1) whether the PUA remained in effect when Fairways' OCS lease expired, (2) whether Fairways' objection to Rooster's RUE request constituted a breach of the PUA, and (3) whether Fairways' objection caused Rooster's damages. Fairways also moved for summary judgment on Rooster's claims for specific performance and injunctive relief, arguing that they cannot be sustained because Rooster has an adequate remedy at law for any harm resulting from the alleged breach of the PUA.

In its order, the Court held that the PUA remained in effect following the termination of Fairways' lease and granted summary judgment to Rooster on that issue. It further noted:

> Having found that the PUA did not terminate upon the termination of Fairways' OCS lease, the Court now addresses whether Fairways' conduct constituted breach of the PUA. In the First Amended Complaint, Rooster claims that Fairways breached the PUA in two separate ways: by filing an objection to Rooster's RUE request and by prematurely declaring the PUA to have terminated. Fairways' primary argument in opposition to Rooster's first theory is that Rooster's RUE request was itself defective. The Court understands that this issue is the subject of an administrative proceeding currently pending before the Interior Board of Land

4

> Appeals. (Rec. Doc. 48-2 at 46-67). Based on the various briefs and evidence submitted thus far, it does appear to this Court that Rooster's RUE request incorrectly asked BOEM for permission to use both the platform and the seabed. Nonetheless, it would be inappropriate for this Court to rule on that issue at this time due to the pending administrative appeal.

(*Id.* at 9-10). In a footnote, it also indicated:

> Because this issue may be fully resolved by the substance of the administrative appeal, the Court also does not decide at this time whether *REO Industries v. Natural Gas Pipeline Co. of Am.*, 932 F.2d 447 (5th Cir. 1991), controls the resolution of this issue.

(*Id.* at 10 n.7).

While the Court also held that Fairways had breached the PUA when it prematurely declared that the PUA had terminated, that holding was later withdrawn after Fairways moved for partial reconsideration. (Rec. Doc. 82). Rooster has since settled with BOEM and voluntarily dismissed any claims against it in both this proceeding and that which was before the Interior Board of Land Appeals. (Rec. Doc. 116).

## II.     PRESENT MOTIONS

As discussed previously, the Court now considers the remaining issue from Fairways' and Rooster's earlier cross-motions for summary judgment (that is, whether Fairways breached the PUA by objecting to Rooster's RUE request) and the issues raised by the latter cross-motions for summary judgment (those are, whether Rooster breached the PUA prior to the RUE request and whether the PUA terminated prior to the RUE request).

### A.     Fairways' Latter Motion for Summary Judgment

Fairways now moves for summary judgment on issues predating its objection to Rooster's RUE request. (Rec. Doc. 122). First, it argues that Rooster materially breached the PUA by failing to comply with applicable statutes and regulations, by failing to conduct its operations in a good and workmanlike manner, and by failing to keep Fairways appraised of its conduct.

Additionally, it argues that Rooster's material breach excused any subsequent breach by Fairways (specifically, when Fairways objected to Rooster's RUE request). Second, it argues that the PUA terminated when Rooster's production fell below the levels specified in the contract because there were months in which it was not producing anything. Last, Fairways alleges that Rooster's use of Fairways' platform following the PUA's termination resulted in Rooster's unjust enrichment.

Rooster responds that Fairways' motion should be denied. (Rec. Doc. 127). First, it argues that it did not materially breach the PUA because it substantially complied with its terms, thus any subsequent breach by Fairways was not excused. It also argues that the testimony of Fairways' expert stating that Rooster received 70 regulatory violations should be excluded because the testimony provides the only basis for that number, which is inconsistent with Fairways' own pleadings and publically available information and because the testimony regarding the meaning of that number is not based on any methodology. Second, Rooster argues that the PUA has not terminated by its own terms because the well remains capable of producing at certain levels, even if there were months in which it was not producing at all. Last, Rooster argues that it was not unjustly enriched because the PUA remains in effect.

Fairways replies that there is no genuine dispute of material fact that would preclude summary judgment. (Rec. Doc. 138). First, Fairways asserts that Rooster has acknowledged that it breached the PUA by failing to comply with applicable regulations and statutes and failing to inform Fairways of its noncompliance. It further argues that the lack of severity of the breaches do not alter the fact that a breach occurred because the substantial compliance doctrine is inapplicable in this type of case (and because Rooster failed to plead it). Second, Fairways

reemphasizes that its own interpretation of the requirement that the well produce in paying quantities should be used.

### B. Rooster's Latter Motion for Partial Summary Judgment

In turn, Rooster has moved for partial summary judgment on Fairways' excuse-of-performance defense. (Rec. Doc. 124). As above, Rooster asserts that it did not materially breach the PUA and therefore Fairways may not be excused from any subsequent breach. Fairways reiterates that the PUA was no longer in effect because Rooster materially breached the PUA and because the PUA terminated by its own terms when Rooster failed to produce in paying quantities. (Rec. Doc. 128). It also notes that Rooster's failure to comply with applicable regulations and statutes exposed it to the possibility of increased decommissioning costs and possible regulatory liability. Rooster replies that because Fairways has failed to demonstrate that it was prejudiced by Rooster's breach, its performance may not be excused.

### C. Fairways' & Rooster's Earlier Cross-Motions for Summary Judgment

The unresolved issue from Fairways' and Rooster's earlier cross-motions for summary judgment is whether Fairways breached the PUA when it objected to Rooster's December 12, 2011, RUE request.[3] (*See* Rec. Doc. 113). Such a breach would have occurred subsequently to the alleged breaches or the alleged termination addressed in the parties' latter cross-motions for summary judgment addressed above.

Rooster argues that Fairways breached the PUA by objecting to its RUE request. First, Rooster asserts that its RUE request was not deficient because federal regulations required that it reference Fairways' platform in its RUE request. (Rec. Doc. 116 at 2-3 (citing 30 C.F.R. § 550.160(a) ("You must need the right-of-use and easement to construct and maintain platforms, artificial islands, and installations and other devices at an OCS site other than an OCS lease you

---

[3] This issue became ripe following the dismissal of BOEM. (*See* Rec. Doc. 113).

7

own . . . .")). Further, it reasserts that it did not seek permission from BOEM to use Fairways' facilities, it only requested authority to maintain the platform at its current location following the termination of Fairways' lease. (*Id.*). Second, Rooster argues that BOEM denied its RUE request solely because Fairways refused to recognize Rooster's rights under the PUA, not because the request was deficient. (*Id.* at 3). Rooster references the April 16, 2012, letter from the BOEM:

> The former lessee and facility owner, Fairways Offshore Exploration, refuses to consent to your access and use of its property. Therefore, there is no basis upon which BOEM can grant a right-of-use and easement. Based upon the foregoing, your request for a right-of-use and easement is hereby denied.

(Rec. Doc. 1-5). It also notes:

> BOEM denied Rooster's application because the former lessee and facility owner, Fairways Offshore Exploration, Inc., refused to consent to Rooster's continued access to and use of its platforms.

(Rec. Doc. 1-6). As a further indication that BOEM's denial turned on Fairways' repudiation of Rooster's rights under the PUA, Rooster references the Court-endorsed stipulation between Fairways and the BOEM, which provides that the BOEM will grant Rooster's RUE request if Fairways recognizes Rooster's rights. (Rec. Doc. 116 at 4). It also notes that if the RUE request had been technically deficient, Rooster could and would have cured it by filing a modified request. (*Id.* at 5).

Fairways, in turn, argues that it did not breach the PUA by objecting to Rooster's December 12, 2011, RUE request. First, Fairways asserts that the RUE request sought permission from BOEM to use Fairways' platform, which rendered it defective because BOEM was not authorized to provide such permission. It notes that "BOEM has consistently made clear that it could not grant the RUE request because [it] was outside the scope of BOEM's authority to grant access only to the seabed." (Rec. Doc. 117 at 3). Accordingly, Fairways contends that its

objection to the RUE could not constitute breach because it had no legal effect. (*Id*. at 3). Second, Fairways argues that even if its objection had effect, it was an "exercise[e of] its legal rights under valid, applicable regulations" and was therefore compliant with the PUA, which expressly subordinated itself to any federal, state, and local regulations. (*Id*. at 4). Third, it argues that the PUA did not impose any affirmative obligation on Fairways to refrain from exercising its right to object. (*Id.*). Last, even if Fairways' objection constituted a breach, the PUA had already terminated by the time that breach occurred (for reasons it addresses in its later motion for summary judgment, discussed below). (*Id*. at 5). The Court will address each of these motions in chronological order.

### III.   LAW & ANALYSIS

#### A.   Standard

Summary judgment is appropriate if the moving party can show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Under Federal Rule of Civil Procedure 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *See Prejean v. Foster,* 227 F.3d 504, 508 (5th Cir. 2000). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253 (1986). Furthermore, "[t]he non-movant cannot avoid summary judgment . . . by merely making 'conclusory allegations' or 'unsubstantiated assertions.'" *Calbillo v. Cavender Oldsmobile, Inc.,* 288 F.3d 721, 725 (5th Cir. 2002) (quoting

*Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994)). In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to the nonmovant. *Id.* at 255. This dispute is governed by Texas law. (Rec. Doc. 61 at 6).

### B. Breach of the PUA by Rooster

Before reaching the issue of whether the PUA terminated on its own and whether Fairways breached the PUA when it objected to Rooster's RUE request, it is necessary to determine whether Rooster breached the PUA by failing to comply with applicable statutes and regulations, by failing to conduct its operations in a good and workmanlike manner, or by failing to keep Fairways appraised of its conduct. Under Texas law, breach of contract requires (1) a valid contract, (2) performance or tender of performance by a party under that contract, (3) a breach of that contract by another party, and (4) damage to the non-breaching party. *Triton 88, L.P. v. Star Elec., L.L.C.*, No. 01–10–00601–CV, 2013 WL 4080738 ), at *10 (Tex. Ct. App. Aug. 13, 2013). The parties do not dispute that a valid contract existed, nor do they dispute that there was performance or tender of performance under that contract. Further, "Fairways [has] reserve[d] for trial a determination of its damages." (Rec. Doc. 122-1 at 8). Accordingly, the only issue before the Court is whether a breach occurred.

"A breach of contract occurs when a party fails or refuses to perform an act that it expressly promised to do." *Methodist Hosps. of Dallas v. Corporate Communicators, Inc.*, 806 S.W.2d 879, 882 (Tex. Ct. App. 1991). However, the breach must be material for the remaining obligations under the contract to be destroyed. *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994); *see also Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004); *Tenn. Gas Pipeline Co. v. Technip USA Corp.*, No. 01–06–00535–CV, 2008 WL 3876141, at *22 (Tex. Ct. App. Aug. 21, 2008). In Texas, the following factors should

> be considered in determining whether a breach is material:
>
>> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981); *see Hernandez*, 875 S.W.2d at 693 & n.2 (Tex. 1994); *Mustang Pipeline Co.*, 134 S.W.3d at 199; *see also Prodigy Commc'ns Corp. v. Agric. Excess & Surplus Ins. Co.*, 288 S.W.3d 374, 378 (Tex. 2009). Generally, "[t]he less the non-breaching party is deprived of the expected benefit, the less material the breach." *Hernandez*, 875 S.W.2d at 693. For instance, in *Hernandez v. Gulf Group Lloyds*, the Texas Supreme Court held that where a party had been deprived of a benefit under a contract and had also stipulated that it had not incurred any financial loss as a result of that deprivation, the breach was not material and the non-breaching party was not prejudiced. *Id.* at 693-94. "However, if the non-breaching party elects to treat the contract as continuing and insists that the party in default continue its performance, the previous breach constitutes no excuse for non-performance on the part of the non-breaching party, and the contract continues in force for the benefit of both parties." *Tenn. Gas Pipeline Co.*, 2008 WL 3876141, at *22. Here, it is necessary to determine whether Rooster committed a material breach of the PUA by failing to comply with applicable statutes and regulations, by failing to conduct its operations in a good and workmanlike manner, and by failing to keep Fairways appraised of its conduct.

      **1.**      **Statutory & Regulatory Noncompliance**

First, it is necessary to determine whether Rooster breached the PUA's requirement that Rooster "comply with . . . all applicable laws, rules, regulations, and orders of any governmental agency having jurisdiction." (Rec. Doc. 122-4 at 57). Specifically, Fairways provides expert testimony indicating that between 2008 and 2010, the BSEE and its predecessors issued 70 incidents of noncompliance ("INCs") to Rooster as operator of Fairways' platform and that the BSEE ordered a shut in on June 11, 2012. However, Rooster notes that, according to publically available data from the BSEE, it was only issued 28 INCs for the HI 154 facilities between 2007 and 2012.[4] (*See* Rec. Doc. 127-7). Rooster notes that it "has addressed all . . . INCs in accordance with the requirements of and to the satisfaction of the BSEE." (Rec. Doc. 127-8 at 2). Further, it appears that the only unresolved INC is being addressed by a BSEE-approved program. (Rec. Docs. 127-8, 127-9). Not only is the number of INCs Rooster received disputed, but also whether receipt of an INC is, in and of itself, a failure to comply with the applicable statutes and regulations. Further, even if receipt of an INC constituted a breach, it is not clear whether this would constitute a material breach of the PUA, especially given the fact that thousands of INCs have been issued each year in the Gulf of Mexico. (*See* Rec. Doc. 127-5). It seems possible, if not likely, that receiving and responding to INCs may be a common industry practice. Regardless, a determination as to whether the receipt of a certain number and type of INCs constitutes a material breach is an issue of fact that precludes summary judgment.

However, Fairways also states that the United States Coast Guard issued notices of violation to Rooster on May 11, 2009, and September 6, 2009, in violation of the Clean Water Act, 22 U.S.C. § 1321(b)(3). These violations, which Rooster indicates were self-reported, each

---

[4] The Court takes judicial notice of the data provided from the BSEE's website. *See* FED. R. EVID. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

involved the accidental discharge of less than one gallon of oil. (*See* Rec. Doc. 127-10 at 3). Further, Rooster was not fined for the first incident and paid only a $250 fine for the second. (*Id.*). Rooster notes that "[b]oth incidents were fully addressed and resolved to the Coast Guard's satisfaction." (*Id.*). Although it appears that Rooster may have violated a statutory requirement, this does not seem to rise to the level of a material breach. Here, Rooster appears to have complied with the statute by self-reporting the accidental spills, and Fairways does not seem to have been deprived of any benefit. Therefore, as above, the significance of Rooster's violation of the Clean Water Act is an issue of fact that precludes summary judgment. Accordingly, it is not possible to decide as whether these violations of statutory and regulatory requirements constituted a material breach of the PUA.

### 2. Perform in a Good & Workmanlike Manner

Second, it is necessary to determine whether Rooster breached the PUA's requirement that it "conduct all operations in a good and workmanlike manner, as would a prudent operator under the same or similar circumstances." (Rec. Doc. 122-4 at 57). Fairways provides expert testimony which indicates that 70 INCs is "an unusually high number " and that "operations . . . were not conducted in a safe and workmanlike manner, as evidenced by the number and severe nature of the INCs." (Rec. Doc. 122-2 at 7). As noted previously, the parties dispute the number of INCs that Rooster received. The expert's assertion that an operator's conduct is not workmanlike by virtue of its receipt of a certain number of INCs is only significant if the number of INCs the operator received is known. Further, as noted above, it appears possible that receiving and responding to INCs may be a common industry practice. If so, Rooster may have operated exactly as a prudent operator would have. Nor is it clear the extent to which a prudent operator would be required to provide notice of such INCs to the owner. Accordingly, it appears that any conclusion as to whether Rooster materially breached the PUA's requirement that it

13

conduct its operation in a workmanlike manner is an issue of material fact precluding summary judgment.

### 3. Failure to Keep Fairways Appraised of Its Conduct

Third, it is necessary to determine whether Rooster breached the PUA by failing to notify Fairways of its statutory and regulatory "violations, or any responsive reports, submissions, or corrective actions," as well as any changes in its production levels. (Rec. Doc. 122-1 at 7). The PUA provides:

> 3.2 <u>Workmanlike Conduct.</u> Unless otherwise provided, Operator shall consult with the Parties and keep them informed of all important matters.
> . . . .
> 3.8 <u>Reports.</u> Operator shall make reports to governmental authorities that it has a duty to make as Operator and shall furnish copies of such reports to Participating Parties. Operator shall give timely written notice to the Parties of all litigation and hearings affecting the Lease or operations hereunder.
> . . . .
> 8.1 [Rooster] agrees to notify [t]he [HI] 154 Owners as soon as reasonably possible of . . . changes in [Rooster] HI . . . 141 Well(s) Production, or any other possible changes . . . include[ing], but not limited to, shut in of well, re-opening of well, . . . .

(Rec. Doc. 122-4 at 57, 59). Not only does the extent to which Fairways and Rooster communicated appear to be shrouded in fact, but so also is the nature of the obligations these provisions imposed on Rooster. Accordingly, a determination as to whether Rooster materially breached any of the requirements of the PUA is an issue of fact that precludes summary judgment.

### C. Termination of the PUA on Its Own

Having concluded that it is not possible at this stage of the proceedings to determine whether Rooster materially breached the PUA, it is necessary to determine whether the PUA terminated on its own after Rooster failed to produce from its wells during certain periods. By its

terms, the PUA "remain[s] in full force and effect" provided that (1) HI 141 is "determined to be producing in paying quantities in accordance with [30] C.F.R. [§] 250.11" and that HI 141 "is producing to [HI 154]." (Rec. Doc. 122-4 at 61).

The parties dispute the significance and meaning of "in accordance with [30] C.F.R. [§] 250.11," because the PUA was signed on November 18, 2001, and 1997 was the last year that § 250.11 existed. In 1998, the section entitled "Determination of well producibility" was moved to § 250.111, where it remained in 1999, and § 250.11 was removed completely.[5] In 2000, the section was bifurcated, again relocated, and renamed, becoming § 250.115, entitled "How do I determine well producibility?," and § 250.116, entitled "How do I determine producibility if my well is in the Gulf of Mexico?" Meanwhile, § 250.111 became a new section, entitled "Who oversees operations under my welding plan?" There were no additional changes to these sections in 2001. Rooster asserts that the parties intended to rely on the 1997 version of the *Code of Federal Regulations*; Fairways contends that the parties' reference to § 250.11 was a "drafting error." (Rec. Doc. 122-1 at 16). Accordingly, it is necessary to determine the significance of § 250.11's inclusion in the PUA.

Under Texas law, whether a contract is ambiguous is a matter of law. *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980). "[T]he primary concern . . . is to ascertain and to give effect to the intentions of the parties as expressed in the instrument." *Id.* "To achieve this object the [c]ourt will examine and consider the entire instrument so that none of the provisions will be rendered meaningless." *Id.* at 519. "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument" *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Further, "the circumstances present when the contract was entered" may be considered. *Id.* at 394.

---

[5] 30 C.F.R. § 250.1 through 30 C.F.R. § 250.99 were also removed.

Specifically, a contract should be construed with reference to the "'ordinary terms, customs and usages then in effect as these are evidence of the intent of the parties.'" *Intratex Gas Co. v. Puckett*, 886 S.W.2d 274, 278 (Tex. Ct. App. 1994) (quoting *Atwood v. Rodman*, 355 S.W.2d 206, 216 (Tex. Civ. App. 1962)). Applying these considerations, a contract is unambiguous when it may be given "a certain or definite legal meaning or interpretation" and is ambiguous "only when the application of the applicable rules of interpretation to the instrument leave it genuinely uncertain which one of the two meanings ins the proper meaning." *R & P Enters.*, 596 S.W.2d at 519. An ambiguous contract raises issues of fact, which preclude summary judgment. *See id.*

Here, the reference to § 250.11 would be "rendered meaningless" if it were treated as a drafting error. It must be assumed that sophisticated parties, such as these, closely scrutinized the PUA's language before executing it, especially language pertaining to termination. Thus, the reference to § 250.11 must have been intentional. Because that section did not exist at the time the PUA was drafted, the parties could only have meant to reference the outdated § 250.11, which was codified in the *Code of Federal Regulations* until 1997. That section provided:

> Determination of well producibility.
> Upon receiving a written request from the lessee, the District Supervisor will determine whether a well is capable of producing in paying quantities (production of oil, gas, or both in quantities sufficient to yield a return in excess of the costs, after completion of the well, of producing the hydrocarbons at the wellhead.) Such a determination shall be based upon the following:
> (a) A production test for oil wells shall be of at least 2 hours' duration following stabilization of flow. A deliverability test for gas wells shall be of at least 2 hours' duration following stabilization of flow or a four-point back-pressure test. The lessee shall provide the District Supervisor a reasonable opportunity to witness all tests. Test data accompanied by the lessee's affidavit, or third-party test data, may be accepted in lieu of a witnessed test, provided prior approval is obtained from the District Supervisor.
> (b) In the Gulf of Mexico OCS Region, the following shall also be considered collectively as reliable evidence that a well is capable of producing oil or gas in paying quantities:

> (1) A resistivity or induction electric log of the well showing a minimum of 15 feet of producible sand in one section that does not include any interval which appears to be water-saturated. In some cases, wells with less than 15 feet of producible sand in one section may be approved by the District Supervisor. All of the section counted as producible shall exhibit the following properties:
> (i) Electrical spontaneous potential exceeding 20-negative millivolts beyond the shale base line. If mud conditions prevent a 20-negative millivolt reading beyond the shale base line, a gamma ray log deflection of at least 70 percent of the maximum gamma ray deflection in the nearest clean water-bearing sand may be substituted.
> (ii) A minimum true resistivity ratio of the producible section to the nearest clean water-bearing sand of at least 5:1.
> (2) A log indicating sufficient porosity in the producible section.
> (3) Sidewall cores and core analyses which indicate that the section is capable of producing oil or gas or evidence that an attempt was made to obtain such cores.
> (4) A wireline formation test and/or mud-logging analysis which indicates that the section is capable of producing oil or gas, or evidence that an attempt was made to obtain such tests.

30 C.F.R. § 250.11 (1997).

The language of the PUA does states that HI 141 is "*determined to be producing* in paying quantities in accordance with [§] 250.11," not simply that it is "*producing* in paying quantities." (Rec. Doc. 122-4 at 61 (emphasis added)). Thus, for the PUA to have terminated, it is not enough that Rooster simply failed to "produc[e] in quantities sufficient to yield a return in excess of the costs"; it must have done so in the manner "determined" by § 250.11. *See* 30 C.F.R. § 250.11 (1997).

Fairways asserts that between July 1, 2008, and November 30, 2009, Rooster operated HI 141 at an economic loss for each 180-day period and that Rooster did not produce oil or gas from HI 141 to HI 154 platform for two months in 2008, three months in 2009, and six months during 2012. (*See* Rec. Doc. 122-3 at 13-14). However, Fairways has not demonstrated that HI 141 was

17

not "producing in paying quantities," as "determined" in accordance with the procedure outlined in § 250.11. For this reason, Fairways has not met its burden in demonstrating that the PUA terminated on its own.

### D.   Breach of the PUA by Fairways

Having concluded that the determination as to whether Rooster materially breached the PUA is an issue of fact and that Fairways has failed to prove that the PUA terminated on its own, the Court briefly considers the issue of whether Fairways breached the PUA by objecting to Rooster's RUE request. As a preliminary matter, it is necessary to determine whether Rooster's RUE request was defective because it sought permission from BOEM to use Fairways' platform. 30 C.F.R. § 550.160 allows BOEM to grant "a [RUE] on leased and unleased lands" to an operator if that operator "must need [it] to construct and maintain platforms, artificial islands, and installations and other devices at an OCS site other than an OCS lease you own . . . ." 30 C.F.R. § 550.160. Rooster's December 12, 2011 request stated that it needed a RUE "for the purposes of maintaining [certain platforms] at the surface locations of . . . [HI] 154." (Rec. Doc. 39-5 at 1). It is apparent that Rooster's RUE request did not need to seek BOEM's permission to use Fairways' facilities; that permission had been granted by Fairways itself through the PUA. Instead, Rooster's RUE request mentioned Fairways' facilities for the purpose of satisfying the § 550.160's requirement that it explain why it was seeking the RUE. As BOEM itself has stated, "when you apply for a [RUE], you must submit a description of all facilities for which you are seeking authorization . . . ." (Rec. Doc. 39-10 at 1). In denying Rooster's RUE request, BOEM explained that Fairways "refuse[d] to consent to [its] access and use of its property . . . [t]herefore, there is no basis upon which BOEM can grant a [RUE]." (*Id.*). It is apparent that Fairways' objection to the RUE request, not any inherent defect in the RUE request itself, was the reason it was denied. However, any determination as to whether Fairways' objection was

itself a breach of the PUA is premature until a determination is made as to whether the contract remained in effect at the time. Likewise, the issue of whether Fairways' further performance was excused cannot be decided without determining that Rooster has breached.

## IV.   CONCLUSION

For the forgoing reasons, **IT IS ORDERED** that Fairways' motion for summary judgment (Rec. Doc. 122) and Rooster's motion for partial summary judgment (Rec. Doc. 124) are **DENIED**.

New Orleans, Louisiana, this 2nd day of December, 2013.

*[signature: Eldon E. Fallon]*

UNITED STATES DISTRICT JUDGE